**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAMMY SIKO, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 23-1184 |
| | ) | |
| v. | ) | District Judge W. Scott Hardy |
| | ) | Magistrate Judge Maureen P. Kelly |
| ASTRAZENECA PHARMACEUTICALS LP, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This employment discrimination action comes before the Court on Plaintiff Tammy Siko's Objections (Docket No. 54) to the Report and Recommendation (Docket No. 53) ("R&R") entered by Magistrate Judge Maureen P. Kelly on April 15, 2025. The R&R recommends that Defendant AstraZeneca Pharmaceuticals LP's ("AstraZeneca") Partial Motion to Dismiss the Second Amended Complaint (Docket No. 43) be granted and that Count II alleging a "regarded as" disability discrimination claim under the Americans with Disabilities Act ("ADA") be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). On April 24, 2025, Siko filed her Objections to the R&R. (Docket No. 54). On May 8, 2025, AstraZeneca filed its Response in Opposition to Objections (Docket No. 55), to which Siko filed a Reply on May 15, 2025. (Docket No. 58). The matter is fully briefed and ripe for decision.

As set forth herein, this Court concludes that the text of the ADA instructs that an employer's companywide COVID vaccine mandate does not magically inoculate that employer from a cognizable disability discrimination claim based upon its perception that a noncompliant employee's immune system was weakened, diminished, or otherwise affected or influenced by her

1

unvaccinated status.  Accordingly, the Court will sustain Siko's Objections and decline to adopt the R&R. AstraZeneca's Partial Motion to Dismiss will be denied.

I.    FACTUAL BACKGROUND[1]

AstraZeneca is a global biopharmaceutical company that employed Siko as a field-based Executive Cardiovascular Hospital Sales Specialist.  (Docket No. 42, ¶¶ 6-7).  In August 2021, AstraZeneca announced it would require all employees to disclose their COVID-19 vaccination status and require unvaccinated employees to wear masks and undergo weekly testing.  (*Id*., ¶¶ 11-12).

On August 19, 2021, Siko was the only unvaccinated employee who attended an all-day work meeting for AstraZeneca employees at a restaurant in Latrobe, Pennsylvania.  (*Id*., ¶ 50).  She was also the only employee in attendance required to wear a mask, though one of the vaccinated employees in attendance tested positive for COVID-19 that same night.   (*Id*.).  AstraZeneca held an emergency call the next morning and told Siko that she alone had to quarantine for seven to ten days, but none of the vaccinated employees who attended the meeting were required to quarantine even though none of them had worn a mask at the meeting.  (*Id*., ¶ 51).

On January 31, 2022, AstraZeneca abruptly revised its COVID policy to impose a COVID-19 vaccine mandate upon Siko and all U.S. employees despite increasing evidence of vaccine inefficacy and an apparent overall decrease in severity of COVID-19 infections nationwide.  (*Id*., ¶ 14).  AstraZeneca's revised policy provided "exemption opportunities" for employees with

---

[1]    The factual allegations set forth in the Second Amended Complaint must be taken as true and viewed in the light most favorable to Siko at this stage of the case.  Accordingly, the factual recitation herein is drawn from Siko's pleadings with all reasonable inferences drawn in a light most favorable to her.  *See Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).  Notably, this recitation does not fully address Siko's allegations concerning her religious discrimination claim because AstraZeneca's Partial Motion to Dismiss does not pertain to that claim.

medical or religious objections and gave until February 26, 2022, for such employees to submit their exemption requests. (*Id.*, ¶ 15). Siko timely submitted her request for exemption on February 25, 2022. (*Id.*, ¶ 17). AstraZeneca subsequently announced that the deadline for employees to either receive the COVID-19 vaccine or have an exemption granted was March 31, 2022. (*Id.*, ¶ 16).

On March 31, 2022, AstraZeneca denied Siko's request for an exemption from its vaccine mandate[2] stating she was not "qualified for a reasonable accommodation" and informed her that she had until April 22, 2022, to comply with its vaccine mandate or "face termination" on April 29, 2022. (Docket Nos. 42, ¶ 21; 42-1). AstraZeneca's denial notice also informed Siko that it is "entitled to deny requests for reasonable accommodation where the request poses undue hardship . . . [which] can include, but is not limited to, business disruption/increased cost resulting from illness-related absences." (*Id.*, ¶ 22; 42-1). The same day Siko received this denial notice, she asked AstraZeneca whether it had taken her natural immunity to COVID-19 into account. (*Id.*, ¶ 23). Then, on April 20, 2022, Siko asked AstraZeneca to reconsider her previously denied exemption request and offered to supply documentation evidencing that she had a natural immunity to COVID-19 because she previously tested positive for it and recovered. (*Id.*, ¶ 28). Nonetheless, AstraZeneca informed Siko that her employment was terminated on April 29, 2022. (*Id.*, ¶ 29).

---

[2]     Siko alleges at Count I of her Second Amended Complaint that AstraZeneca unlawfully discriminated against her based on her Christian religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), because it failed to afford alternatives to the COVID-19 vaccine mandate to accommodate her religious beliefs and practices and then terminated her employment for failing to become vaccinated. (Docket No. 42, ¶¶ 17-22, 27-9, 32-37). Again, those allegations are not germane to AstraZeneca's motion currently pending before the Court.

Siko avers that those employees who complied with AstraZeneca's vaccine mandate received an mRNA-based COVID-19 vaccine authorized by the U.S. Food and Drug Administration ("FDA") for emergency use were "physically changed" by it. (*Id.*, ¶¶ 42-45). She further avers that because of this "physical difference," AstraZeneca regarded Siko as having a physiological condition limiting her immune system due to her unvaccinated status and despite her natural immunity, and thus considered her to be much more likely to be infected by COVID-19 than vaccinated employees, thereby rendering her unable to perform her job. (*Id.*, ¶¶ 45-46, 55).

Furthermore, Siko avers that AstraZeneca regarded her and other employees who did not receive a COVID-19 vaccine in compliance with its mandate, unlike its vaccinated employees, "as if they were perpetually infected by COVID-19, even when asymptomatic, and/or perpetually substantially more susceptible of becoming infected by COVID-19 and then infecting others . . .." (*Id.*, ¶ 41). Siko also avers that AstraZeneca perceived her purported immunocompromised and infectious condition to be serious, current, indefinite, and substantially limiting of all her major life activities that involve personal interaction with others because AstraZeneca viewed her and other unvaccinated employees as posing an unacceptable risk to others and that such employees were unable to perform a range of jobs, including Siko's job, and also believed that reasonable accommodations or modifications (such as continued masking and testing) would not eliminate or effectively reduce that perceived threat. (*Id.*, ¶¶ 49, 60, 64-65). AstraZeneca's perception that Siko was immunocompromised and thus impaired is made manifest by requiring Siko to quarantine when exposed to a coworker who tested positive for COVID-19 despite having natural immunity and being masked, but not requiring other exposed vaccinated coworkers to quarantine because it did not perceive them to be similarly immunocompromised. (*Id.*, ¶ 56).

Siko also avers that her perceived immunocompromised condition was not minor because the symptoms, hospitalization, and mortality rates for COVID-19 are much more severe and higher when compared to other illnesses such as swine flu and seasonal flu (*Id*., ¶ 47), and because AstraZeneca perceived her condition to be serious enough that she needed to be physically quarantined for seven to ten days after being exposed to someone (despite themselves having been vaccinated) who tested positive for COVID-19. (*Id*., ¶¶ 57, 60). Siko also alleges that AstraZeneca believed her perceived immunocompromised condition would require frequent quarantines that would significantly and indefinitely restrict her ability to work.  (*Id*., ¶¶ 57, 60). More broadly, Siko alleges that AstraZeneca systematically discriminated against those employees who did not receive COVID-19 vaccines in compliance with its policy mandate. (*Id*.). As such, AstraZeneca "singled out Siko personally" for less favorable treatment and ultimately fired her because it "assumed that [she], unlike her [unmasked but vaccinated] coworkers, had symptoms of and was afflicted with COVID-19, was disabled as such, and could not work due to the perceived disability." (*Id*., ¶¶ 29, 50, 54).

Finally, Siko avers that the science and data available to AstraZeneca regarding the efficacy of the COVID-19 vaccine at the time it terminated her employment supports the conclusion that Siko and other unvaccinated coworkers posed no more threat to AstraZeneca's workforce, vendors, or customers, than did its vaccinated employees.  (*Id*., ¶ 63). Ultimately, Siko contends that AstraZeneca's perception that Siko's immune system was impaired because she did not receive the COVID-19 vaccine, and despite her natural immunity, is based upon stereotypes, stigma, unwarranted fears, and ignorance rather than on reliable medical or other objective evidence and individualized assessments of Siko's actual condition.  (*Id*., ¶ 58).

II.    PROCEDURAL BACKGROUND AND STANDARD FOR REVIEWING OBJECTIONS
TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION.

This is the second time this Court is addressing Siko's objections to a report and recommendation that her disability discrimination claim be dismissed.  This Court adopted an earlier R&R[3] (as modified) as its Opinion and granted AstraZeneca's Motion to Dismiss Plaintiff's ADA claim because, in this Court's view, the First Amended Complaint insufficiently plead factual averments to state a plausible ADA "regarded as" claim for failure to aver facts identifying Siko's perceived impairment.[4] (Mem. and Ord. of Ct., Docket No. 41, Sep. 9, 2024.).  Following the Court's ruling, Siko amended her Complaint to add more factual averments to support her ADA "regarded as" claim that AstraZeneca perceived her as being immunocompromised because of her unvaccinated status and therefore regarded her as having a physical impairment[5] and discriminated against her because of it.  (*See* Docket No. 42, ¶¶ 42-49, 52-58, 60-62, 65-66.).  AstraZeneca once again seeks to dismiss Siko's ADA claim, contending that Siko's Second Amended Complaint did not cure those pleading deficiencies.  (Docket No. 43).  The R&R recommends granting that motion.  (Docket No. 53).  This Court disagrees.

As noted above, Siko timely objected to the R&R, so this Court must conduct a *de novo* review of any part of the R&R that has been properly objected to.  *See* Fed. R. Civ. P. 72(b)(2), (b)(3); 28 U.S.C. § 636(b)(1). In doing so, the Court may accept, reject, or modify the recommended disposition, as well as receive further evidence or return the matter to the magistrate

---

[3]    *See* Docket No. 33 (referred to herein as the "First R&R").

[4]    Siko's First Amended Complaint alleged claims for religious discrimination at Count I, disability discrimination at Count II, and age discrimination at Count III.  The Court dismissed the disability and age discrimination claims without prejudice and gave Plaintiff leave to file another amended complaint. Siko subsequently filed her Second Amended Complaint realleging religious and disability discrimination claims while reserving appellate rights for the dismissed age discrimination claim that she did not replead.

[5]    Siko asserted this same contention in her briefing in response to AstraZeneca's prior Motion to Dismiss and in her Objections to the First R&R (Docket Nos. 26 at 9-11; 34 at 6-7), but that argument was not grounded on any factual averments contained in the then-operative complaint.  *See* Memorandum Op., at 10 n.10.  (Docket No. 41).

judge with instructions.  *See id.*  The underlying matter at issue here is whether Siko sufficiently

plead a plausible ADA "regarded as" claim – specifically, whether Siko plead that she was

"regarded as having such an impairment" within the meaning of 42 U.S.C. §§ 12101(1)(C) and

(3). In undertaking a *de novo* review of the R&R, this Court must evaluate AstraZeneca's Motion

to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and the clearly established authority set forth in

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and

their progeny. Accordingly, this Court must accept all factual allegations contained in the Second

Amended Complaint as true, it must construe those factual allegations in the light most favorable

to Siko, and it must "determine whether, under any reasonable reading of the complaint, [Siko]

may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting

*Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Twombly*, 550 U.S. at

563 n.8.

Although Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement

of the claim showing that the pleader is entitled to relief," the pleading must "'give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Phillips*, 515 F.3d at 231

(quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).  Moreover,

while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than

an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S.

at 555); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). To survive a motion to dismiss,

"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Supreme

Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).

To review a complaint under this standard, the Court proceeds in three steps.  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  First, the Court notes the elements of the claim.  *See id.* (citing *Iqbal*, 556 U.S. at 675).  Second, the Court eliminates conclusory allegations. *See id.* (citing *Iqbal*, 556 U.S. at 679).  And finally, the Court assumes the remaining well-pleaded facts are true and assesses "'whether they plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

III.    ADA "Regarded As" Claims

The employment subchapter of the ADA[6] prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other

---

[6]      The ADA was enacted in 1990 and is codified at 42 U.S.C. § 12101 *et seq*.  Congress amended the ADA by the ADA Amendments Act of 2008.  *See* Pub. L. No. 110-325, 122 Stat. 3553, 3558 (2008).  As amended, the ADA is comprised of four subchapters: (I) employment; (II) public services; (III) public accommodations and services operated by private entities; and (IV) miscellaneous provisions.  In addition to these subchapters, the ADA also contains certain generally applicable provisions expressing Congressional "findings and purpose" at 42 U.S.C. § 12101, and a statute-wide definition of "disability" and other terms at 42 U.S.C. §§ 12102 – 12103. Certain of these generally applicable provisions are critically important here, along with the subchapter pertaining to employment, which is codified at 42 U.S.C. §§ 12111 – 12117.

terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). The text of the ADA expressly construes this provision to include several additional prohibited actions that are set forth at 42 U.S.C. § 12112(b)(1)-(7). Among these additional prohibitions is "limiting [or] segregating a[n] . . . employee in a way that adversely affects the opportunities or status of such . . . employee because of the disability of such . . . employee[,]" 42 U.S.C. § 12112(b)(1), and "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities . . .." 42 U.S.C. § 12112(b)(6).[7] Siko alleges that AstraZeneca discriminated against her and then terminated her employment because it regarded her as being immunocompromised after she declined to abide by its COVID-19 vaccine mandate and despite her natural immunity. Here, AstraZeneca seeks to dismiss Siko's disability discrimination claim by contending that she was not "regarded as having such an impairment" within the meaning of 42 U.S.C. §§ 12102(1)(C) and (3).  In accordance with the process outlined above for evaluating a pleading when deciding a motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court will now outline the elements of pleading and proving a "regarded as" disability discrimination claim under the ADA, *Connelly*, 809 F.3d at 787, noting that the parties dispute what the ADA requires to establish such a claim.

To state an ADA employment discrimination claim, Siko must allege: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without the employer's reasonable accommodations; and (3) she has

---

[7]    The use of such qualification standards, tests, or selection criteria that is "shown to be job-related for the position in question and is consistent with business necessity" is not considered discriminatory.  42 U.S.C. § 12112(b)(6). Moreover, the ADA provides a defense if "performance" of such qualification standards, tests, or selection criteria "cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a).  It is also a defense for a qualification standard to "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).

suffered an adverse employment decision as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010); *Rocco v. Gordon Food Service*, 998 F. Supp. 2d 422, 425 (W.D. Pa. 2014). AstraZeneca's Motion to Dismiss is narrowly focused on whether Siko adequately pleads that she is a disabled person in the "regarded as" sense, so only the first of these three elements is relevant at this juncture.

    A.    The Ordinary Public Meaning of "Impairment" Used In 42 U.S.C. §§ 12102(1)(C) and (3) Supplies the Operative Standard Upon Which Siko's Pleading Must be Measured.

The ADA provides three variant definitions of the term "disability." 42 U.S.C. 12102(1)(A), (B), and (C). Siko need only plead enough to establish one of them. The first variant is an actual disability, the second is having a record of a disability, and the third is being regarded as such. *Id*. Here, although the principal issue in dispute is whether Siko adequately pleads that she is disabled within the meaning of the "regarded as" variant, it is helpful to consider the definitions of both "actual" and "regarded as" variants comparatively to better understand the statutory contours of a "regarded as" ADA claim. "As always, we start with the statutory text[.]" *Lundeed v. 10 West Ferry Street Operations LLC d/b/a Logan Inn*, 156 F.4th 332, 337 (3d Cir. 2025) (citing *Garland v. Cargill*, 602 U.S. 406, 415 (2024)).

The ADA defines an individual with an *actual* disability, pursuant to 42 U.S.C. § 12102(1)(A), as one who has "a physical or mental impairment that substantially limits one or more major life activities of such individual." By contrast, the ADA defines an individual who is *regarded as* disabled, pursuant to 42 U.S.C. §§ 12102(1)(C) and (3)(A), as one who is "regarded as having such an impairment" if that "individual establishes that he or she has been subjected to an action prohibited [by the ADA][8] because of an actual or perceived physical or mental

---

[8]    Actions prohibited by the ADA are delineated at 42 U.S.C. §12112(a) and (b).

impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §§ 12102(1)(C) and (3)(A).[9] So, while these statutory definitions each incorporate certain identical terms (*e.g.*, physical or mental impairment, major life activities, etc.), they fundamentally differ by their textual usage and context within the statutory framework such that an actual disability, as defined by Section 12102(1)(A), or even merely an actual impairment, need <u>not</u> be averred and ultimately proven to establish the "regarded as" variant of an ADA-covered disability pursuant to 42 U.S.C. §§ 12102(1)(C) and (3). *See also Jakomas v. City of Pittsburgh*, 332 F. Supp. 3d 342, 645-648 (W.D. Pa. 2018) (interpreting the ADA Amendments Act of 2008 as no longer requiring a showing that an impairment substantially limit a major life activity to establish a "regarded as" claim); *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 690-91 (W.D. Pa. 2014) (same). Rather, all that the plain text of the ADA requires for establishing that a person is "regarded as" disabled within the meaning of 42 U.S.C. §§ 12102(1)(C) and (3) is that the employer *perceive* there to be a physical or mental impairment, regardless of whether such impairment actually limits or is perceived to limit a major life activity.[10] *Id.* It is also noteworthy that Congress directs courts to construe 42 U.S.C. § 12102(1) (defining each variant of disability) "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by [the ADA's] terms." 42 U.S.C. § 12102(4)(A).

The text of the ADA, both pre- and post-2008 Amendments, and applicable case law, instruct this Court to determine the existence of an ADA-covered disability on an individualized, case-by-case basis. Indeed, once again, the text of the ADA expressly provides that "[t]he term

---

[9]    For "regarded as" claims, the ADA expressly excludes actual or perceived impairments that are "transitory and minor." 42 U.S.C. § 12102(3)(B). See *infra*.

[10]    Major life activities are also defined expressly in the ADA. 42 U.S.C. § 12102(2)(A) and (B). *See infra*.

'disability' means, with respect to an *individual* – . . . (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (emphasis added), and that "[a]n *individual* meets the requirement of 'being regarded as having such an impairment' if the *individual* establishes that he or she has been subjected to a [prohibited] action . . .." 42 U.S.C. § 12102(3)(A)) (Emphasis added); see also *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 517 (W.D. Pa. 2010) ("the ADA requires an individualized inquiry into the ability of an employee or applicant to perform a particular job, one which focuses on the medical condition's actual effect on the specific plaintiff. . . . In conjunction with this requirement, the Court of Appeals for the Third Circuit has held that under the ADA, it is the employer's burden to educate itself about the varying nature of an impairment and to make individualized determinations about affected employees . . .."); *Taylor*, 177 F.3d at 192-93 ("the ADA . . . requires an interactive relationship between employer and employee, and concomitantly requires an individualized evaluation of employees' impairments . . . under the ADA, it is the employer's burden to educate itself about the varying nature of impairments and to make individualized determinations about affected employees . . . it is not reasonable for an employer to extrapolate from information provided by an employee based on stereotypes or fears about the disabled . . . A belief that anyone with bipolar disorder or HIV infection is substantially limited in a major life activity is a conclusion about the effects of the impairment and only secondarily about the particular employee. An employer with such a belief is failing to make an individualized determination, as the ADA requires, and thus acts at its peril."). Moreover, courts also instruct that pleading a "regarded as" claim is not difficult. *See, e.g., EEOC v. BNSF Railway Co.*, No C14-1488MJP 2016 WL 98510 at *8 (W.D. Wash.  Jan. 8, 2016) (Describing the threshold for a regarded as claim as an "extremely low bar"); *Garcia-Hicks v.*

*Vocational Rehab Admin.*, 148 F. Supp. 3d 157, 167 (D. P.R. 2015) (citing case that "emphasiz[e] the low bar for establishing a disability under the post-ADAAA standard.")

With the foregoing text, statutory definitions, and contextual framework in mind, the critical legal inquiry at issue here is simply to determine the meaning of the term "impairment" as used in 42 U.S.C. §§ 12102(1)(C) and (3). The ADA itself does not expressly supply a definition, though the EEOC provides a regulatory definition of "impairment" at 29 C.F.R. §1630.2(h) [11]. However, as the Supreme Court recently affirmed, courts must exercise independent judgment in determining the meaning of statutory provisions. *Loper Bright*, 603 U.S. 369, 395 (2024). "In exercising such judgment . . . courts may . . . seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance . . ..'" *Id*., at 394 (internal quotation omitted). Courts may consider an agency's regulation for guidance and its weight "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give

---

[11]     Although Congress originally tasked the United States Department of Justice ("DOJ"), the United States Department of Transportation ("DOT"), and the United States Equal Employment Opportunity Commission (the "EEOC") with specified authority to enforce different components of the ADA, the Supreme Court noted in 1999 that no agency "has been given authority to issue regulations implementing the generally applicable provisions of the ADA [42 U.S.C. §§ 12101 – 12102] . . .. Most notably, no agency has been delegated authority to interpret the term 'disability.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479 (1999). Even so, the EEOC issued regulatory guidance without Congressional authority in 1992, supplying its own definitions for certain constituent terms in the text of the ADA that Congress uses to define "disability," namely: "(1) 'physical or mental impairment,' (2) 'substantially limits,' and (3) 'major life activities.'" *Id. (citing* 29 C.F.R. § 1630.2(h)–(j) (1992)). The EEOC likewise issued unauthorized iterative definitions of the term "impairment" beginning in 1992, *e.g.*, 29 C.F.R. § 1630.2(h) (1992). Congress subsequently enacted the ADA Amendments Act of 2008, Pub. L. 110–325, 122 Stat. 3553 (2008), which, among other things, provides statutory definitions for the terms "disability" and "major life activities" and supplies related rules of construction applicable to these statutory terms and related definitions. *See* 42 U.S.C. § 12102. It also authorized the EEOC to issue regulations implementing the definitions of disability in 42 U.S.C. § 12102. 42 U.S.C. § 12205a. Courts have noted that Congress amended the ADA specifically to address certain impairments, including cancer, HIV-AIDS, epilepsy, diabetes, multiple sclerosis, amputated and partially amputated limbs, post-traumatic stress disorder, and intellectual and developmental disabilities, that were not receiving the protection Congress initially intended. *See Koller v. Riley Riper Hollin & Calagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012)); *see also Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 217 (3d Cir. 2024) (noting that the ADA Amendments Act of 2008 expanded the scope of coverage under the ADA).

it power to persuade . . . ." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Even when Congress delegates authority to an agency, as done here in 2008 for "issuing regulations implementing the definitions of disability in [42 U.S.C. § 12102]," see 42 U.S.C. § 12205a, the role of the reviewing court is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. *Loper Bright*, 603 U.S. at 395. As stated in *Loper Bright*, "[t]he court fulfills that role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority,' . . . and ensuring the agency has engaged in 'reasonable decisionmaking' within those boundaries." *Id.* (internal citations omitted).

In fulfilling this independent duty to effectuate the will of Congress, the Supreme Court instructs that a statute be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020). So, what does the statutory term "impairment" mean? The Webster's New World College Dictionary defines an "impairment" as "a deterioration or weakening." *Impairment*, YourDictionary.com, http://yourdictionary.com/impairment (last visited December 10, 2025). The Merriam-Webster Dictionary defines "impairment" as "diminishment or loss of function or ability." *Impairment*, Merriam-Webster.com, http://merriam-webster.com/dictionary/impairment (last visited December 10, 2025). *See also* The American Heritage Dictionary of the English Language (defining "impair" as "[t]o cause to weaken, be damaged, or diminish, as in quality.") (https://ahdictionary.com/word/search.html?q=impairment) (last visited December 10, 2025).

Here, not only is the statutory term "impairment" understood by its plain and ordinary public meaning as illuminated by its dictionary definitions delineated above, but it is further understood by the context of its usage within the statute.  The text of the ADA expressly defines an actual disability as an "impairment" that is "physical or mental" and that "substantially limits"

"one or more major life activities." *See* 42 U.S.C. § 12102(1)(A) (including major bodily functions per 42 U.S.C. § 12101(2)(A) and (B)). So, in the context of the ADA's statutory framework, an impairment is understood in relation to one's major bodily functions and other major life activities, and, in fact, is something that imposes a substantial limit upon one or more of those major life activities. *See* 42 U.S.C §§ 12102(1)(A) and 12102(2)(A) and (B)[12]. But, while the term "impairment" is also used for defining a person who is "regarded as" disabled, the clear and unambiguous statutory text plainly states that for such "regarded as" claims, a person's actual or perceived impairment need not be shown to limit or be perceived to limit a major life activity. *See* 42 U.S.C. § 12102(3)(A). All that is required is that the employer regard the person as having an actual or perceived impairment, nothing more. Accordingly, the best reading of the ADA's clear and unambiguous statutory text is that an "impairment" in the context of whether a person is "regarded as" disabled within the meaning of 42 U.S.C. §§ 12102 (1)(C) and (3)(A) is the actual or perceived weakening, diminishment, or deterioration of a major bodily function or other major life activity, even if such impairment does not "limit" or be perceived to "limit" any of those major bodily functions or other major life activities.

In support of its Motion to Dismiss and in Response to Siko's Objections to the R&R, AstraZeneca points to the aforementioned EEOC regulatory definition of "impairment" at 29 C.F.R. §1630.2(h) (2011). That regulation, when recited in full, defines an "impairment" as:

> (1)    Any *physiological* disorder or *condition*, cosmetic disfigurement, or anatomical loss *affecting* one or more *body systems*, such as neurological, musculoskeletal, special sense organs, respiratory (including speech

---

[12]    Major life activities are defined expressly in the text of the ADA to "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). A major life activity also "includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

organs), cardiovascular, reproductive, digestive, genitourinary, *immune*, circulatory, hemic, lymphatic, skin, and endocrine; or

(2)     Any mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1), (2) (emphasis added)[13]. As relevant here, this regulation defines an impairment as a "physiological . . . condition . . . affecting one or more body systems, such as . . . [the] immune [system] . . .." 29 C.F.R. § 1630.2(h)(1). There is nothing ambiguous about the text of this regulation. The key terms at issue are "physiological condition" and "affects." The American Heritage Dictionary of the English Language defines the term "physiological" to mean "[b]eing in accord with or characteristic of the normal functioning of a living organism." "Physiological,"           The           American           Heritage           Dictionary, https://ahdictionary.com/word/search.html?q=physiological+ (last visited December 10, 2025). Moreover, when read in context and compared with the regulatory phrase "mental or psychological disorder" in 29 C.F.R. § 1630.2(h)(2), it is evident that the term physiological relates to physical conditions rather than mental or psychological ones. The term "condition" is defined as "[a] mode or state of being," a "state of health." "Condition," The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=condition (last visited December 10, 2025). And, the term "affect" is defined as meaning "[t]o have an influence on or effect a change in" or "to attack     or     infect,     as     a     disease."     "Affect,"     American     Heritage     Dictionary, https://ahdictionary.com/word/search.html?q=affects (Last visited on December 10, 2025). So, when considering the plain and ordinary meaning of these unambiguous regulatory terms in the context of Siko's factual averments, the statutory phrase "being regarded as having such an

---

[13]     In its Response in Opposition to Siko's Objections, AstraZeneca omits from its quotation of 29 C.F.R. § 1630.2 (h) (1) the portion of that regulation specifically referencing the immune system. *See* Docket No. 55, at 7.

'impairment'" as defined by the EEOC in 29 C.F.R. § 1630.2(h)(1) simply means having an actual or perceived "physiological condition" (*i.e.*, a person's physical state of being or health) "affecting" (*i.e.*, having an influence on or effect a change in) their immune system. Compare this regulatory formulation to the Court's formulation above: the actual or perceived weakening, diminishment, or deterioration of the immune system. In this Court's estimation, the portion of 29 C.F.R. § 1630.2(h)(1) that posits a regulatory definition of "physical impairment" to include a physiological condition that affects the immune system is congruent with this Court's independent textual and contextual interpretation of the statutory term "impairment" as used in 42 U.S.C. § 12102(1)(C) and (3)(A). This regulation offers no reasons to change the Court's interpretation of the statutory term "impairment" or its application to Siko's pleadings.  Rather, it confirms it.

The EEOC's regulatory definition links its term "physiological condition" to a list of "body systems" much the same way the Court performs a contextual analysis of the statute itself by linking "physical impairments" to statutorily defined "major bodily functions" and other "major life activities." The EEOC's regulatory term "body systems" supplies a list of such systems inexplicably different in form from Congress' list of "major bodily functions" contained in the ADA itself, yet those two parallel lists converge upon the one system or function relevant in this case – the immune system.  *Compare* 42 U.S.C. § 12102(2)(A) and (B) with 29 C.F.R §1630.2(h)(1).  Moreover, the EEOC's usage of "affecting" is seemingly less stringent and thus more apt than the terms "weakening," "diminishing," and "deteriorating," because those words convey a meaning closer to "limiting," which the ADA expressly says is not required for establishing a "regarded as" claim.  And, interpreting the term "impairment" by using the term "affecting" to link a physical condition to a body system or major bodily function results in broader coverage under the ADA as directed by Congress at 42 U.S.C. § 12102(4)(A) and thus is most

consistent with the statutory text. Accordingly, then, an individual "being regarded as having such an impairment" includes an individual with an actual or perceived physical state of being or health condition "affecting" or "influencing" his or her immune system. The Court will apply this formulation for evaluating whether Siko adequately plead a plausible "regarded as" disability discrimination claim pursuant to 42 U.S.C. §12102(1)(C) and (3).

B.    AstraZeneca Invited Error by Contending That an Actual or Perceived Impairment Cannot Exist as a Matter of Law if Caused by Siko's Personal Choice Not to Receive the COVID-19 Vaccine.

In contrast to the text and structure of the ADA and the current EEOC regulation defining "impairment," AstraZeneca instead advocates for an erroneous standard that Siko's personal choice not to receive a COVID-19 vaccine somehow negates or otherwise undermines the sufficiency of her factual averments that it perceived her as having an impaired immune system. AstraZeneca's advocacy for this contention invited error in the R&R and it will not be adopted here.

AstraZeneca's contention errantly relies upon nonprecedential and noncontrolling cases devoid of reasoning tethered to the ADA's actual text defining the "regarded as" variant of a covered disability in support of its proposition that one's unvaccinated status, or the personal decision to remain unvaccinated, nullifies otherwise sufficient factual averments that such person has an actual or perceived impairment. While AstraZeneca presents this argument as "well-established" and grounded on "black-letter" law[14], that is hardly true as the Third Circuit has yet to decide this issue. The district court decisions relied upon by AstraZeneca have no controlling force and must be evaluated for their persuasive worth. This Court previously evaluated this line

---

[14]    *See* Docket Nos. 33, at 6-7; 55, at 6.

of cases[15] in its prior Memorandum Order and found them to be unavailing. (Docket No. 41, at 5). Nonetheless, because the Court did not specifically base its earlier decision on that conclusion but instead overruled Siko's objections and dismissed her prior complaint because it lacked sufficient factual averments to establish that she was perceived as having an impaired major bodily function or other major life activity, and because AstraZeneca persists in reasserting the arguments found within these district court opinions,[16] the Court will now address these issues once again and in greater depth. In doing so, this Court acknowledges that it stands alone among the various district courts confronted with this issue of first impression in the Third Circuit. Here, the Court evaluates the factual averments contained in the pleadings by drawing all reasonable inferences in Siko's favor and by measuring those averments against the actual text of the ADA as Congress enacted it rather than through a blurred Covid-lens construct.

In support of the R&R, AstraZeneca principally relies upon a decision from the Eastern District of Pennsylvania, *Beard v. Phila. Corp. for Aging*, No. 22-3331, 2023 WL 4685976 (E.D. Pa., July 21, 2023) (Murphy, J.), and two such decisions from a single judge in the District of Maryland, *Friend v. AstraZeneca Pharm. LP*, No. SAG-22-03308, 2023 WL 3390820, at * 4 (D. Md., May 11, 2023) (Gallagher, J.), motion for reconsideration denied, 2023 WL 4867514 (D. Md.

---

[15]    *See Johnson v. Mount Sinai Hosp. Grp., Inc.*, No. 22-CV-2936, 2023 WL 2163774, at *6 (E.D.N.Y. Feb. 22, 2023), *motion for relief from judgment denied*, 2023 WL 3159233 (E.D.N.Y. Apr. 28, 2023); *Friend v. AstraZeneca Pharms. LP*, Civ. No. 22-03308, 2023 WL 3390820, at *4 (D. Md. May 11, 2023); *Doe(s) v. Pittsburgh Reg'l Transit*, 684 F. Supp. 3d 417, 428 (W.D. Pa. 2023); *Speaks v. Health Sys. Mgmt., Inc.*, Civ. No. 5:22-CV-00077, 2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022); *Chancey v. BASF Corp.*, No. 3:22-cv-34, 2022 WL 18438375, at *3 (S.D. Tex. Dec. 29, 2022), *aff'd sub nom. Chancey v. BASF*, No. 23-40032, 2023 WL 6598065 (5th Cir. Oct. 10, 2023); *see also* Mem. of Law in Sup. of Def.'s Partial Mot. to Dismiss the Am. Compl. (Docket No. 21 at 11-13 (citing cases)); Reply Mem. of Law in Further Sup. of Def.'s Partial Mot. to Dismiss the Am. Compl. (Docket No. 27 at 4-5 (citing cases)); and Def.'s Resp. in Opp. to Pl.'s Obj. to the R&R (Docket No. 36 at 6-8 (citing cases)).

[16]    The Court notes that AstraZeneca simply reasserts its prior arguments based upon many of the same district court decisions. AstraZeneca does not attempt to counter or otherwise respond to this Court's criticisms of those arguments found in its earlier Mem. Op. (Docket No. 41), and instead it mainly repeats itself seemingly expecting a different outcome.

July 31, 2023), and *Foshee v. AstraZeneca Pharm. LP*, No. SAG-23-00894, 2023 WL 6845425, at *5-6 (D. Md. Oct. 17, 2023) (Gallagher, J.).  (Docket No. 55 at 2-6). This Court finds the reasoning in these cases to be unpersuasive.

*Beard* was decided in 2023, yet it defines "regarded as" disability discrimination claims not by the ADA's current statutory text, but by case law and an EEOC regulation that long-predates the ADA Amendments Act of 2008, citing *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir. 1999) (reciting an older version of an EEOC regulation expressing what the EEOC considered necessary to be "regarded as" having a disability prior to the ADA's amendment in 2008, citing 29 C.F.R. §1630.2(l) (1996) (defining a person "regarded as" having a disability for purposes of the ADA as someone who: (1) has an impairment that does not substantially limit major life activities but is treated as such; (2) has an impairment that does substantially limit major life activities but only as a result of the attitudes of others towards such impairment; or (3) has no such impairment, but the [employer] treats that person as having a substantially limiting impairment."). AstraZeneca's reliance on *Friend* and *Foshee* is similarly misplaced because those cases likewise cite the same mistaken "substantially limiting" standard.  *Friend*, 2023 WL 3390820, at * 4; *Foshee*, 2023 WL 6845425, at * 5-6.  This incorrect definitional standard materially misstates the actual text of the ADA, which provides: "whether or not the impairment *limits* or is perceived to *limit* a major life activity." 42 U.S. C. § 12101(C)(1) (emphasis added); *see also* 29 C.F.R. §§ 1630.2(l), (2025).  The outdated and now abrogated regulatory definition relied upon by *Beard*, *Friend*, and *Foshee* required proof of a limitation on a major life activity, whereas the ADA presently imposes no such requirement that a real or perceived impairment even insubstantially limit a major life activity.  Not only had Congress not delegated authority to the EEOC to supply a definition for the "regarded as" variant of the term disability at the time *Taylor* relied upon that

regulation, *Sutton*, 527 U.S. at 479, but that obsolete regulation materially differs from the current text of the ADA as enacted by Congress. It also differs from the EEOC's current regulatory definition.

*Beard* also mistakenly requires a "regarded as" plaintiff to "show that the employer misinterpreted information about the person's limitations to conclude that they were unable to perform a 'wide range or class of jobs[,]'" 2023 WL 4685976, at * 4 (citing *Keyes v. Cath. Charities of the Archdiocese of Phila.*, 415 F. App'x. 405, 410 (3d Cir. 2011) (affirming a district court's grant of summary judgment upon concluding that the plaintiff was not able to prove that his employer misinterpreted information about his limitations to conclude that he was unable to perform a "wide range or class of jobs.").  This is incorrect.  The actual text of 42 U.S.C. §12102(3)(A) expressly states that it is <u>not</u> necessary to show that the actual or perceived impairment limits or is perceived to limit a major life activity, whether it be working as in *Beard*, Siko's immune system[17] as is relevant here, or some other statutorily identified major life activity. *See* 42 U.S.C. §12102 (2)(A) (defining "working" as a major life activity) and 42 U.S.C. §12102 (2)(B) (defining major life activities to include major bodily functions such as "the immune system"). As fully explained above, the ADA Amendments Act of 2008 supplies the now-operative definition of a "regarded as" claim at 42 U.S.C. §§ 12102(1)(C) and (3). S*ee also* 29 C.F.R. § 1630.2(h)(1).

*Beard*, *Friend*, and *Foshee,* also incorrectly hold that an "employee's refusal to get a vaccine required by an employer is not itself an 'impairment,' and rather 'reflect[s] a personal choice . . . that . . . cannot be considered an impairment under the ADA,' because refusing to get a

---

[17]     The Court notes that Siko also may be alleging that AstraZeneca perceived her major life activity of working to be affected, influenced, or limited, too.  (*See* Docket No. 42, ¶¶ 49, 54, 55, 60, 61, 64). The parties do not argue that point in briefing on the presently pending motion so the Court will not address it.

vaccine required by an employer is not a disability of any sort." *Beard*, 2023 WL 4685976, at *4 (citing cases, including *Speaks v. Health System Management*, No. 5:22-CV-00077-KDB-DCK, 2022 WL 3448649, at * 5 (W.D.N.C. Aug. 17, 2022)). *See also Johnson v. Mount Sinai Hosp. Grp., Inc.*, Civ. No. 22-CV-2936-AMD, 2023 WL 2163774, at *6 (E.D.N.Y. Feb. 22, 2023); *Jorgenson v. Conduent Transport Solutions, Inc.*, No. SAG-22-01648, 2023 WL 1472022 (D. Md. Feb. 2, 2023). However, the reasoning in these cases is superficial and circular. Importantly, these cases ignore the actual text of the ADA that merely requires Siko to aver facts sufficient to support an inference that she had an actual or perceived impairment, here a perception that her immune system was affected or influenced, which is all that 42 U.S.C. §§12102(1)(C) and (3) requires, and not whether or not it is limited or substantially limited.

By relying on *Beard*, *Friend*, and *Foshee*, including cases cited therein such as *Speaks*, AstraZeneca seems to argue, again, that an actual or perceived impairment cannot exist as a matter of law if it is caused by the individual's personal choice. It bears repeating that there is nothing in the express statutory text of the ADA that nullifies the existence of an impairment caused by one's personal choices. Accordingly, these decisions improperly extend beyond judicial authority. *Lundeen*, 156 F.4th at 332, 2025 WL 2935340, 339 (citing *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019)); *see also Bostock*, 590 U.S. at 654 ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.").

Not only is there no textual basis to preclude a person with an actual or perceived impairment as being "regarded as" disabled pursuant to 42 U.S.C. §§12102(1)(C) and (3), but to interpret the text of the ADA as such would defy logic. As this Court previously stated,[18] there are a myriad of impairments that can be caused either by an individual's personal volition or otherwise, such as by genetics or disease. Examples include an individual who becomes paraplegic after a vehicular collision caused by that person's choice to drive a car recklessly, or when such paralysis is caused by genetics, disease, or, in the case of a vehicular collision, by the recklessness or negligence of another driver. A paralyzed person has an impairment either way. Similarly, individuals with diabetes have an endocrine disorder, and thus an impairment, regardless of whether that disorder was caused by genetics, family history, and/or certain dietary and other personal lifestyle choices. Other examples abound. An individual's physical or mental condition either constitutes an impairment, or it does not, regardless of how that individual came to be in such condition. If the condition does constitute an impairment, it either substantially limits a major life activity and thus constitutes an actual disability, or it does not. In fact, Congress went so far as to instruct that the determination of whether an impairment substantially limits a major life activity (*i.e.*, constitutes an actual disability) "shall be made without regard to the ameliorative effects of mitigating measures such as – medication." 42 U.S.C. § 12102(4)(E)(i).

And, to repeat, Siko is lodging a "regarded as" claim here which does not require that she plead and eventually prove the existence of an actual impairment, much less one that substantially limits a major life activity. Rather, all that she must plead at this juncture is that AstraZeneca perceived her to have an impairment, and she satisfies this requirement by pleading that AstraZeneca did perceive her immune system to be affected or otherwise influenced. So,

---

[18]    *See* Mem. Op. at 8-10. (Docket No. 41).

considerations of Siko's personal choice to remain unvaccinated are even further removed when applying the ADA's statutory text to determine if a person is "regarded as having such an impairment," where the key determination is whether the employer took an action "because of" the individual's actual or perceived physical or mental impairment.  *See* 42 U.S.C. § 12102(3)(A). Indeed, for such claims the focus is on the employer, not the employee, because the statutory text requires an examination of the perceptions made by the employer, that is, whether the employer perceived the employee as having an impairment, and of the employer's motivation for taking the prohibited action(s) at issue.  42 U.S.C. § 12102(3)(A).  And, while one's personal choices have no bearing on whether that person has an impairment, an employer's opinions or views of those personal choices (critical or otherwise) and whether such views contributed to its perceptions of the employee's physical or mental condition, including its motivations for taking a prohibited action against that employee, are likely to be highly probative of whether the employer regarded someone to be impaired as required by 42 U.S.C. §§ 12102(1)(C) and (3).

Moreover, *Friend* and *Foshee*, as well as various similar district court decisions, erroneously suggest that actual or perceived limitations on one's major life activities caused by societal rules fall outside the ADA's "regarded as" purview. Yet, nothing in the text of the ADA states that such so-called "societal rules" nullifies prohibited actions taken because of the employer's perception that an employee has an impairment. In fact, some such "societal rules" may supply the discriminatory stereotypes, stigmas, unwarranted fears, and ignorance made unlawful by the ADA. Congress' findings and purposes set forth in the ADA Amendments Act of 2008 provides that people with "disabilities are frequently precluded from [fully participating in all aspects of society] because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers." *See* Pub. L. 110–325, 122 Stat. 3553 (2008) (Section 2(a)(2)).  The ADA

itself contains a statement of Congress' findings that "individuals with disabilities [including those who are regarded as having a disability] continually encounter various forms of discrimination, including outright intentional exclusion, . . . overprotective rules and policies, . . . [and] exclusionary qualification standards and criteria, . . .." 42 U.S.C. § 12101(a)(1) and (5).

C.    AstraZeneca's Company-Wide Implementation of its Vaccine Mandate Strengthens the Inference That It Regarded Siko as Having an Impaired Immune System.

In further support of its arguments, AstraZeneca emphasizes that it required all employees to get vaccinated and that implementing a universally applicable vaccination requirement for all employees further inoculates it from scrutiny under the ADA. (Docket No. 55, p. 8). Citing *Librandi v. Alexion Pharm., Inc.*, No. 3:22-cv-1126 (MPS), 2023 WL 3993741, at *6 (D. Conn. June 14, 2023), AstraZeneca seems to contend that it would be implausible to infer that it perceived all noncompliant unvaccinated employees such as Siko to have an impaired immune system. AstraZeneca and cases such as *Librandi* have it backwards. The fact that AstraZeneca imposed a company-wide qualification standard in the form of a vaccine mandate because it believed unvaccinated employees universally had a weakened or an otherwise affected or influenced immune system actually strengthens the inference that it regarded Siko (and all other unvaccinated employees) as having an impairment in accordance with 42 U.S.C. §§ 12102(1)(C) and (3). The opposite view is both illogical and in contravention of this Court's duty pursuant to Fed. R. Civ. P. 12(b)(6) to construe all factual allegations in Siko's favor, for if AstraZeneca did not hold the view that unvaccinated employees were immunocompromised then it would have no reason to impose such a far-reaching qualification standard to purge unvaccinated employees from its ranks to ameliorate its concern that unvaccinated employees posed risks it did not desire for its workforce.

In this Court's estimation, it is reasonable to infer from AstraZeneca's imposition of a company-wide vaccine mandate and its termination of Siko's employment for failing to abide by it, that AstraZeneca plausibly harbored a perception that Siko's immune system was weakened or otherwise affected or influenced. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. Even so, as discussed above, there are plenty of other factual averments contained in Siko's Second Amended Complaint to support this inference even without the allegation that AstraZeneca imposed its vaccine mandate company-wide.

Therefore, contrary to the holdings in the cases referenced in the R&R and relied upon by AstraZeneca, this Court concludes that there is no statutory basis to negate Siko's factual averments that AstraZeneca perceived her immune system to be affected or influenced by not receiving the COVID-19 vaccine notwithstanding her own putative natural immunity.

IV.    SIKO SUFFICIENTLY ALLEGES THAT ASTRAZENECA REGARDED HER TO BE IMPAIRED BECAUSE IT PERCEIVED HER TO BE IMMUNOCOMPROMISED.

Having outlined the elements for establishing a "regarded as" ADA claim, the Court now turns to assessing the well-pleaded facts contained in Siko's Second Amended Complaint to determine whether those averments plausibly give rise to an entitlement to relief. *Connelly*, 809 F.3d at 787 (citing *Iqbal*, 556 U.S. at 679).

The question at issue is whether Siko plead sufficient factual averments to support an inference that AstraZeneca perceived one or more of Siko's major bodily functions or other major life activities to be impaired, even if such perceived impairment does not actually limit or be perceived by AstraZeneca to limit any such major bodily functions or major life activities[19]. As

---

[19]    The ADA also requires that Siko establish that she "has been subjected to an action prohibited . . . because of an actual or perceived . . . impairment . . . ." 42 U.S.C. § 12102(3)(A). The Court observes that Siko adequately pleads sufficient facts to state a plausible claim on this point and AstraZeneca does not seek to dismiss Siko's Second Amended Complaint on this basis. The Court further notes that while the principal issue before it at this preliminary

explained above, the term "impairment" is not defined by the ADA itself but is used contextually in relation to the statutory term "major life activities." The ADA expressly defines a major life activity to include major bodily functions such as the immune system. 42 U.S.C. § 12102(2)(B); *see also* 29 C.F.R. §1630(h)(1) (2025). So, the Court must discern whether Siko's pleadings adequately aver facts that AstraZeneca perceived Siko's immune system to be "impaired," which is understood both by the ordinary public meaning of the statutory text and by the applicable Congressionally authorized EEOC regulation to mean "affected" or otherwise "influenced." To do so, then, Siko must simply allege facts that AstraZeneca perceived her immune system to be affected or influenced, though not necessarily limited or substantially limited. 42 U.S.C. § 12102(3)(A). There is no basis in the text of the ADA itself, nor in any controlling decisional authority, to impose an additional pleading or proof requirement that such perceptions are negated or ignored as a matter of law if based upon or derived from the employee's personal choices, such as an employee who has natural immunity to COVID-19 and chose to decline receiving the FDA emergency use-approved COVID-19 vaccine.

To cure pleading deficiencies identified by this Court when it overruled Siko's objections to the First R&R, Siko filed a Second Amended Complaint in support of her claim that AstraZeneca regarded her as disabled within the meaning of 42 U.S.C. §§ 12102(1)(C) and (3). In doing so, Siko now avers additional factual allegations that AstraZeneca perceived her to be immunocompromised and infectious because she did not receive a COVID-19 vaccine and despite her natural immunity, and therefore it imposed more onerous requirements upon her, and then

---

juncture is whether Siko adequately averred facts sufficient to establish that she was "regarded as" disabled to plausibly state an ADA employment discrimination claim, doing so does not necessarily result in a finding of liability as these allegations must ultimately be proven by sufficient evidence. Furthermore, AstraZeneca may seek to assert various statutory and other defenses such as undue burden and direct threat. Those issues are also not presently before the Court and are not being addressed at this preliminary juncture.

terminated her employment, whereas it did not subject Siko's vaccinated coworkers to those more onerous conditions nor terminate their employment.  (Docket No. 42, ¶¶ 41, 46-47, 49, 67). Notably, AstraZeneca made Siko wear a mask while attending an all-day work meeting at a restaurant because it perceived her as being immunocompromised and infectious, while all other employees who attended that meeting were not required to wear masks because they were vaccinated and thus not perceived to be immunocompromised and infectious. (Docket No. 42, ¶50). Then, AstraZeneca singled Siko out again by requiring her to quarantine for seven to ten days because another employee who attended that meeting tested positive for COVID-19 that same night, while all other employees in attendance were not required to quarantine, again because AstraZeneca perceived Siko, and only Siko, to be immunocompromised.  (Docket No. 42, ¶¶ 50-51). Siko also avers that AstraZeneca directed her to become vaccinated by a date-certain or be fired absent securing an exemption in accord with its subsequently revised COVID-19 policy and then ignored her natural immunity and terminated her employment when she did not get vaccinated or secure an exemption, once again because AstraZeneca perceived her to be immunocompromised.  (*Id*., ¶ 15). Siko further avers that AstraZeneca perceived her as being immunocompromised despite her natural immunity because she did not become "physically changed" by the mRNA-based COVID-19 vaccine that the other employees received, and despite the science and data available to AstraZeneca concerning the efficacy of the vaccine supporting the conclusion that Siko and other unvaccinated coworkers posed no more threat to themselves or AstraZeneca's workforce, vendors, or customers than did its vaccinated employees.  (*Id*., ¶ 63). Siko also points to AstraZeneca's notice denying her request to be exempted from its vaccine mandate, expressing concerns about "business disruption/increased costs resulting from illness-related absences." (*Id*., ¶ 22; 42-1). Finally, Siko avers that AstraZeneca's perceptions about her

immune system are based upon stereotypes, stigma, unwarranted fears, and ignorance, rather than on reliable medical or other objective evidence and individualized assessments of Siko's actual condition.  (*Id.*, ¶ 58).  When considering these averments and all reasonable inferences drawn therefrom in accord with *Iqbal* and *Twombly*, the Court concludes that Siko's factual averments satisfy the requirements for pleading that AstraZeneca plausibly regarded her as "having such an impairment" pursuant to 42 U.S.C. §§ 12102(1)(C) and (3).

AstraZeneca also contends that Siko did not sufficiently plead that her purportedly perceived impairment is not transitory nor minor.  When amending the ADA in 2008, Congress expressly provided that "regarded as" claims cannot arise from "impairments that are transitory and minor."  42 U.S.C. § 12102(3)(B).  Congress' use of the conjunctive "and" in 42 U.S.C. § 12102(3)(B) compels an interpretation that impairments must be both transitory and minor to be excluded from actionable "regarded as" claims.  *See also Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 247-251 (3d Cir. 2020) (reversing a district court's judgment dismissing a "regarded as claim" because the district court failed to evaluate separately whether the impairment at issue was both transitory and minor.). An impairment that is minor but not transitory, or *vice versa*, may still be regarded as a disability under 42 U.S.C. §12102(1)(C) and (3). Consequently, perceived impairments that are not *both* transitory and minor are sufficient to support a "regarded as" disability claim under the ADA, and Siko has plead sufficient factual averments to do so here.

First, Siko avers that AstraZeneca perceived her immune system to be so affected, influenced or weakened that it regarded her as if she were "perpetually infected by COVID-19, even when asymptomatic, and/or perpetually substantially more susceptible of becoming infected by COVID-19 and then infecting others than those who had COVID-19 vaccination."  (Docket No. 42, ¶ 41).  Siko also avers that AstraZeneca perceived that she would "frequently need to be

quarantined . . . and that such repeated quarantines would significantly restrict her ability to do her work indefinitely." (*Id*., ¶ 60). The ADA defines a "transitory" impairment as "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). At this preliminary pleading stage, these averments that Siko's perceived impairment is frequent, perpetual, and indefinite plausibly satisfy the statutory requirement that it not be "transitory" with an actual or expected duration of 6 months or less. 42 U.S.C. § 12102(3)(B).[20]

Separately, Siko avers that AstraZeneca perceived her immune system to be so impaired that she "needed to be physically quarantined for seven to ten days after exposure to someone that tested positive for COVID-19." (*Id*., ¶ 57). Siko also avers that AstraZeneca perceived her purportedly impaired immune system to pose a threat that she would contract COVID-19 herself or infect coworkers, vendors, and customers, that it expected her "condition to result in serious business disruption and increased costs resulting from her illness-related absences," that the "symptoms, hospitalization, and mortality rates for COVID-19 are much more severe and higher when compared to other illnesses such as swine flu and seasonal flu," and that it considered her perceived weakened immune system serious enough to justify terminating her employment. (*Id*., ¶¶ 47-48, 63-65). The ADA does not expressly define the term "minor" so courts "have approached [such interpretation] on a case-by-case basis" and the "not minor requirement is only intended to exclude impairments 'at the lowest end of the spectrum of severity,' such as 'common ailments like the cold or flu.'" *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 224 (3d Cir. 2024) (citing *Eshleman*, 961 F.3d at 249)). The American Heritage Dictionary of the English Language

---

[20]    It is also reasonable to infer from Siko's factual allegations that her perceived impairment exists in the present, and she is not merely perceived as having the potential to develop a disability in the future. Accordingly, this case is distinguished from *Chancey v. BASF*, the 5th Circuit dismissed a COVID vaccine ADA "regarded as" claim because the perceived impairment was prospective. No. 23-40023, 2023 WL 6598065, at *2 (5th Cir. Oct. 10, 2023).

defines "minor" as "[l]esser or smaller in amount, extent, or size[;]" "[l]esser in seriousness or danger."    "Minor,"    American    Heritage    Dictionary, https://ahdictionary.com/word/search.html?q=minor (Last visited Dec. 10, 2025).  *See* also *Goodwin v. Univ. of Pennsylvania*, No. 23-3211, 2024 WL 4678877, at *2 (3rd Cir., Nov. 5, 2024) (affirming district court's decision finding that ankle injury was minor because the symptoms and severity of the injury was "mild" and the nature and scope of any post-operative care was "limited"). Here, at this preliminary pleading stage, Siko's averments characterize AstraZeneca's perception of her purportedly weakened immune system to be something serious enough to quarantine her and ultimately remove her from the workforce completely, which is far more serious than common ailments like a cold or flu, and hardly mild or limited.  Accordingly, these averments plausibly satisfy the statutory requirement that her perceived impairment not be "minor." 42 U.S.C. § 12102(3)(B).

V.    Conclusion

Siko alleges facts in her Second Amended Complaint sufficient to establish that AstraZeneca perceived the condition of her immune system to be weakened, diminished, or otherwise affected or influenced, that such perceived condition existed in the present and was not transitory and minor, and thus that she was "regarded as having such an impairment" as required by 42 U.S.C. §§ 12102(1)(C) and (3)(A) to state a plausible "regarded as" disability discrimination claim under the ADA. Moreover, notwithstanding other decisions to the contrary, the text of the ADA informs the Court that an employee's noncompliance with an employer's policy mandate for its entire workforce to receive a COVID-19 vaccine does not magically inoculate that employer from a cognizable disability discrimination claim based upon its perception that the employee's immune system was affected or influenced by her unvaccinated status.  There is nothing about

COVID-19 that requires or otherwise permits this Court to suspend a reasoned and logical application of the actual text of a statute duly enacted by Congress to reach a different result. To do so would extend beyond proper judicial authority. In reaching this conclusion, the Court notes that Siko must still prove her factual allegations which the Court must assume to be true at this preliminary stage of the case. Additionally, the Court expresses no opinion at this juncture without a fully developed evidentiary record as to whether AstraZeneca can show that its company-wide COVID-19 vaccine mandate, as applied to Siko, was a job-related qualification standard or selection criteria consistent with business necessity or that Siko's noncompliance with that company-wide vaccine mandate posed a "direct threat" to the health or safety of others in the workplace. *See* 42 U.S.C. §§ 12113(a) and (b). Those issues are subjects for discovery and subsequent adjudication on the merits.

Accordingly, the Court rejects the recommended disposition in the R&R (Docket No. 53) pursuant to Fed. R. Civ. P. 72(b)(3) and 28 U.S.C. §636(b)(1), sustains the Objections to the R&R (Docket No. 54), and denies Defendant AstraZeneca's Partial Motion to Dismiss the Second Amended Complaint (Docket No. 43). An appropriate Order follows.

/s/ *W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: December 10, 2025

cc/ecf: All counsel of record